Court Of Appeals
Fourth Court of Appeals District of Texas
San Antonio


★ ★ ★  ★ ★ ★

## MEMORANDUM OPINION

No. 04-08-00871-CR

Larry **BUCHANAN**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 399th Judicial District Court, Bexar County, Texas
Trial Court No. 2006-CR-9973
Honorable Juanita A. Vasquez-Gardner, Judge Presiding

Opinion by:     Phylis J. Speedlin, Justice

Sitting:          Phylis J. Speedlin, Justice
                 Rebecca Simmons, Justice
                 Steven C. Hilbig, Justice

Delivered and Filed: January 27, 2010

AFFIRMED

Larry Buchanan appeals his conviction for arson, asserting the evidence is legally and

factually insufficient to prove he committed arson.  We affirm the trial court's judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

Noemi Maldonado and Buchanan were married in July 2006 after a brief courtship.

Buchanan moved in and lived with Maldonado in her house located at 2527 Buffalo Pass in Bexar

County, Texas. Maldonado was under the impression that Buchanan did not drink or smoke, and was a religious man. According to Maldonado, a couple of weeks after their marriage, Buchanan's attitude toward her changed and he became emotionally abusive and unreasonably jealous of her male co-workers, "questioning her every move" and accusing her of cheating on him with no justification. Buchanan and Maldonado began arguing often, and Buchanan would call Maldonado vulgar names.

On August 19, 2006, a Saturday evening, a male friend and his girlfriend stopped by to visit Maldonado at her house. Buchanan made it clear the visitors were not welcome, and they left shortly thereafter. Buchanan went out for a walk, and when he returned began yelling at Maldonado about her bringing "f***ing niggers" into the house and wanting to "screw" them. Maldonado locked Buchanan out of the bedroom that night. On Sunday they went to church together. Afterward, Buchanan said he still wanted to barbeque that afternoon. They stopped at the grocery store and bought food and lighter fluid for the charcoal briquettes. Buchanan barbequed outside that afternoon. At about 4:30 p.m., Buchanan asked to borrow the car to drive to the corner convenience store about one minute away. Maldonado tried calling Buchanan on his cell phone to come home because her daughter needed to borrow the car, but he did not answer. Finally, a young man who said his name was "Andrew" answered the phone, and told Maldonado that "this man that kind of looked like he was crazy" left the phone there. When Maldonado told him that was her husband, Andrew "got kind of scared," and asked her not to tell Buchanan anything "because he looks kind of crazy."

Just as Maldonado and her brother, Sam Sandoval, were about to go retrieve the cell phone from Andrew, Buchanan arrived back home in the car. Maldonado stated that when Buchanan got

out of the car he was "almost like falling down, like staggering, like I had never seen that side of him." She asked him what was wrong with him, but Buchanan ignored her. Sandoval drove Buchanan over to Andrew's house to pick up the lost cell phone. After they retrieved the phone, Buchanan insisted on being let out of Sandoval's car, "literally almost . . . ran out [of the car] while [Sandoval] was driving." Sandoval described Buchanan as being "very agitated," and "a totally different person" than he had known Buchanan to be when they did work together in the past. When Sandoval returned without Buchanan, Maldonado decided to have Buchanan's cell phone service turned off because he was not answering the phone. Later that evening, Buchanan returned home and fell asleep on the couch. Out of concern for her safety, Maldonado's brother insisted she come over to his house to wait for her daughter. Before leaving the house, Maldonado reached into Buchanan's pocket and took the extra house key because her daughter had the other house key on the ring of car keys. Maldonado and her daughter returned home at about 10:00 p.m. Buchanan woke up and left the house, but returned shortly after realizing he did not have the house key in his pocket. He demanded that Maldonado return his house key, and when she refused, Buchanan raised his voice and "acted like he was going to hit [her]." Instead, Buchanan grabbed Maldonado's purse and ran outside the house. Maldonado chased after him and they began fighting over the purse in the front yard. Maldonado's daughter saw the scene and called the police. Before the police arrived, Buchanan ran off without the purse. At about midnight, Buchanan called Maldonado asking to be let inside the house; she refused. Sandoval stated that Buchanan showed up at his house, down the street from his sister's house, at about 1:15 a.m. Buchanan was "very angry," and Sandoval had to warn him he would call the police if Buchanan did not leave.

Monday morning, August 21, 2006, Buchanan showed up at Maldonado's house at about 6:15 a.m., asking for the pocket change he had in his jeans. Maldonado gave him about $10 in change, and told Buchanan, "I guess this is it." Buchanan replied, "well, this is what you wanted" and told her to "have a good day and have a good life." Buchanan was wearing a light blue shirt and blue jeans. Maldonado went to work, and her daughter went to class. At approximately 12:45 p.m., Buchanan called Maldonado at work and "started going off on [her]." Buchanan threatened that "if he didn't get his money he was going to kill [Maldonado] and [her] daughter." Buchanan also made a series of threatening phone calls to Sandoval that day, with the first call at approximately 11:15 a.m., and continuing every 15 minutes or so thereafter. Buchanan demanded that Sandoval pay him the $50 he owed Buchanan for work they had done together, and threatened that the lives of Maldonado and her daughter depended on the $50 payment. Sandoval stopped answering Buchanan's calls when "they started getting really, really out of hand." Buchanan's last call went to Sandoval's voice mail at approximately 2:00 p.m. On the message Buchanan stated, "this is the last warning" and "I'm going to show you better than I can tell you."[1] Sandoval was able to determine that Buchanan's calls were coming from the convenience store near Maldonado's house. Sandoval was concerned for the safety of his sister and her daughter, and when Maldonado left work at 4:30 p.m. that day she went over to Sandoval's house instead of going home.

At approximately 2:30 p.m. that day, Lance Wersonick, a neighbor who lived across the street from Maldonado, saw Buchanan walking down the street toward Maldonado's house; there was no one else out along the street. He waved at Buchanan, and noticed that he appeared

---

[1] At trial, Sandoval testified to the contents of Buchanan's voice mail message, and a cassette tape of the message was also introduced into evidence.

"frustrated." Wersonick saw Buchanan go to the front door, but he was not able to get inside. He then saw Buchanan walk across the yard and enter the side gate to reach the backyard; he could hear Buchanan mumbling and cursing to himself. A few moments later, Wersonick heard a "boom, boom" and assumed it was Buchanan "trying to kick the door in or something." Wersonick went inside his own house. About 30 minutes later, Wersonick was leaving his house and saw "smoke billowing out" the open front door of Maldonado's house. Wersonick ran across the street and yelled out Buchanan's name but received no reply. Another neighbor, Gabriel Castillo, saw the smoke at about 3:10 p.m. or 3:15 p.m. and called 911; he then entered the side gate of Maldonado's house. Castillo observed that one of the French doors in the back was open and the glass was broken. Castillo also saw that a lot of fire and smoke was coming from a big broken window on the corner backside of the house.

Having no knowledge of the fire, Sandoval was driving Maldonado home to her house about 5:00 p.m. when she noticed Buchanan at the corner convenience store, "slouched almost like on the ground with a duffel bag . . . like he was all out of it." Buchanan was wearing jeans and a white polo shirt, different clothes than he was wearing that morning. When Maldonado reached her house and saw the fire department and police, she told the officers she suspected Buchanan and had just seen him at the corner store. When Buchanan was arrested, he had several items belonging to Maldonado in his possession: wine glasses that had been a wedding gift; a lot of her jewelry; towels; clothing; and some small electronics. He did not have those items with him when he left the house that morning.

Firefighters and police arrived at Maldonado's house at approximately 3:00 p.m. The main area of fire damage was Maldonado's bedroom. A pile of clothing at the foot of Maldonado's bed

kept re-igniting itself, which was "unusual" because normally clothing should be immediately extinguished by the direct application of water. Given the re-ignition of the clothing pile and the broken French door panes with no fire damage on the inside, the firefighters suspected a criminal act and called the fire investigators. The investigators determined that the fire originated in Maldonado's bedroom. Suspecting that an ignitable liquid such as charcoal lighter fluid may have been used on the clothing pile to start the fire, Ernest Christilles, an investigator for the Bexar County Fire Marshal, took two samples from the scene; however, they tested negative for medium petroleum distillate. Christilles also called in Tommy Hubertus, an investigator with the State Fire Marshal's office who brought out Buddy, a canine trained to locate accelerants. Buddy alerted on three areas and Hubertus took a sample from each area. One of the three samples, the sample taken from "the floor by the bedroom to the bath entry," tested positive for ignitable liquid residue, specifically a medium petroleum distillate such as charcoal lighter fluid. Both investigators explained that a sample may not test positive for many reasons, including the ignitable liquid residue being evaporated or consumed in the fire, or washed away or diluted by the water, or the sample being improperly collected and packaged. Finally, the lead investigator, Christilles, ruled out all possible accidental causes of the fire like gas and electricity, cigarettes, and household appliances. The fire was ruled non-accidental and intentionally set, and Buchanan was charged with arson.

### ANALYSIS

Buchanan contends the evidence is legally insufficient to support the jury's verdict finding he had the requisite intent to commit arson, and factually insufficient to prove he was the perpetrator of the arson. The State responds that although there is no direct evidence implicating Buchanan in

the arson, there is overwhelming circumstantial evidence proving Buchanan had the necessary intent to commit arson and was the person who set the fire.

In reviewing legal sufficiency, we consider all the evidence, both direct and circumstantial, in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). It is the jury's role "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Clayton*, 235 S.W.3d at 778; *Mosley v. State*, 983 S.W.2d 249, 254-55 (Tex. Crim. App. 1998) (jury is sole judge of the credibility of the witnesses and the weight to be given their testimony). As the reviewing court, we must "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Clayton*, 235 S.W.3d at 778 (quoting *Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007)). We resolve any inconsistencies in the testimony, and any conflicting inferences, in favor of the verdict. *Id.*; *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000). In reviewing factual sufficiency, we consider all the evidence in a neutral light, giving almost complete deference to the jury's determinations of credibility. *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008). We will reverse the conviction only if the evidence in support of the verdict, although legally sufficient, is so weak that the verdict is clearly wrong and manifestly unjust, or if, considering conflicting evidence, the verdict is outweighed by the great weight and preponderance of the evidence. *Id.*; *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006).

In the indictment, the State charged Buchanan with committing arson by: (1) starting a fire, (2) with intent to damage and destroy a habitation, (3) knowing that said habitation is located on property belonging to another. TEX. PENAL CODE ANN. § 28.02(a)(2)(D) (Vernon Supp. 2009). A person acts with "intent" to damage or destroy a habitation when it is the person's conscious objective or desire to engage in the conduct or cause the result. TEX. PENAL CODE ANN. § 6.03(a) (Vernon 2003). The jury was instructed to find Buchanan guilty of arson if they found beyond a reasonable doubt that, with intent to damage or destroy a habitation, he started a fire by igniting combustible material with an open flame, knowing that said habitation was located on property belonging to another, to wit: Noemi Sandoval Maldonado. The jury returned a general "guilty" verdict.

In his legal sufficiency challenge, Buchanan asserts there is "no evidence" to prove he had the requisite intent to damage or destroy Maldonado's house. Buchanan stresses that even though there is evidence he made threats to kill Maldonado and her daughter, he never specifically threatened to "burn down her house." He further asserts that because no physical evidence of an open flame like a lighter or matches was found, there is "no evidence" that the fire was intentionally set. We begin by noting that it is uncommon for there to be direct evidence of a person's intent to commit arson; rather, intent is generally proven by circumstantial evidence from which intent may be reasonably inferred. *Beltran v. State*, 593 S.W.2d 688, 689 (Tex. Crim. App. [Panel Op.] 1980) (while intent can be inferred from the accused's acts, words, and conduct in an arson case, intent cannot be inferred from the mere act of burning); *Miller v. State*, 566 S.W.2d 614, 617-18 (Tex. Crim. App. [Panel Op.] 1978); *Krebsbach v. State*, 962 S.W.2d 728, 734 (Tex. App.—Amarillo 1998, pet. ref'd). Here, the jury was entitled to infer Buchanan's intent from his acts, words, and

conduct during the relevant time period before and after the fire. *Beltran*, 593 S.W.2d at 689; *Krebsbach*, 962 S.W.2d at 734. There was testimony that the day before the fire Maldonado told Buchanan their marriage was over and kicked him out of the house with no cell phone or belongings and very little money. While motive does not by itself prove a person committed arson, it is a factor to be considered. *Krebsbach*, 962 S.W.2d at 734. In addition, there was considerable evidence that the day before the fire Buchanan was behaving strangely, in a manner completely different from his usual calm demeanor. Buchanan appeared to be staggering and almost falling down when he returned from the convenience store on Sunday afternoon after leaving his cell phone at a stranger's house; he acted "very agitated" and "very angry," almost jumping out of Sandoval's car while he was driving, disappearing from the house again, and later returning to argue with Maldonado and struggle over her purse in the front yard before running off. In addition, on the day of the fire, Buchanan began making violent phone threats to both Maldonado and Sandoval, threatening to kill Maldonado and her daughter if he did not receive a $50 payment. Within one hour of when the fire started, Buchanan made a final threat which was recorded by Sandoval, stating that this was "the last warning" and that he "could show you better than I can tell you."

In addition to the evidence of Buchanan's threats and angry behavior, two fire investigators testified that the fire was not accidental, but was intentionally set; residue of an ignitable liquid such as charcoal lighter fluid was detected in one sample taken from Maldonado's bedroom, which was the origin of the fire; a pile of clothing at the foot of her bed kept re-igniting, which was unusual and suggested the presence of an igniter; and there was evidence of forced entry into the home through the broken French doors on the backside of the house. Further, Maldonado testified that Buchanan had barbequed using charcoal lighter fluid on Sunday afternoon, the day before the fire. This

evidence of Buchanan's motive, threats, angry behavior, and presence before the fire, when combined with the evidence that the fire was intentionally started using an ignitable liquid, supports a reasonable inference by the jury that Buchanan had the intent to damage or destroy Maldonado's home. *See Krebsbach*, 962 S.W.2d at 734. We overrule Buchanan's first issue on appeal.

In his factual sufficiency challenge, Buchanan contends the evidence is too weak to prove that he was the person who started the fire. This argument likewise fails in view of the record. In addition to the evidence of Buchanan's threatening words and actions on the day before and the day of the fire, including his "last warning" call made from the corner store one hour before the fire, a neighbor saw him at Maldonado's house within thirty minutes of when the fire started; Buchanan made his last threat at 2:00 p.m. and the firefighters arrived at approximately 3:00 p.m. Wersonick testified that at 2:30 p.m. he saw Buchanan at Maldonado's house, but he was locked out and cursing. Wersonick heard a loud "boom, boom" noise after Buchanan went around to the back; he assumed Buchanan had "kicked the door in." Wersonick stated there were no other people outside on the street at that time. Within thirty minutes, Wersonick saw smoke billowing out Maldonado's open front door, and Buchanan was gone. Another neighbor, Castillo, ran over to Maldonado's house when he saw the fire and he observed that a glass French door on the patio was broken. Moreover, Buchanan was found at the convenience store down the street from Maldonado's house at approximately 5:00 p.m., and had several items from Maldonado's house in his possession; he was also wearing a different shirt than he had on that morning.

While mere presence at the scene of a fire is insufficient to prove that Buchanan committed the arson, it is a factor to be considered. *Krebsbach*, 962 S.W.2d at 734; *McLendon v. State*, 167 S.W.3d 503, 508-09 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd). When Buchanan's presence

at the house within thirty minutes of the fire is combined with the other evidence of his threatening words and actions toward Maldonado, the recent break-up of their marriage, and the physical evidence at the house showing a forced entry and the use of a liquid igniter to start the fire in Maldonado's bedroom, it is clear that the evidence proving Buchanan was the perpetrator of the arson is not "so weak" that the jury's verdict was clearly wrong and manifestly unjust. *See McLendon,* 167 S.W.3d at 509 (noting that direct evidence is not required to prove arson, and holding circumstantial evidence was factually sufficient to support finding that appellant started the fire). Moreover, Buchanan did not present or develop any contradictory evidence as to the cause or origin of the fire, or as to his intent, conduct, or presence near the time of the fire. Buchanan argues there was conflicting evidence as to the cause of the fire because only one of the five samples tested positive for ignitable liquid residue; however, both of the fire investigators testified as to several reasons why a particular sample might not test positive, and the jury was entitled to credit their testimony. We conclude the evidence is factually sufficient to support the jury's finding that Buchanan was the person who set the fire. *Watson*, 204 S.W.3d at 414-15. Accordingly, we overrule Buchanan's second issue.

Based on the foregoing analysis, we affirm the trial court's judgment.


Phylis J. Speedlin, Justice

DO NOT PUBLISH